**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROBERT McCARTY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 17 C 3261** |
| | ) | |
| **v.** | ) | **Magistrate Judge Cole** |
| | ) | |
| **MENARDS, a corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

In February of 2017, Robert McCarty and his employee, Tristan Parks, went to the Menard's in Antioch, Illinois, to purchase materials for a building renovation project. One of the things they needed was 3/4" thick, 4' by 8' oriented strand board ("OSB"), similar to particle board. They rented a Menard's pickup truck, drove it into the lumber shed, and began selecting and loading sheets of OSB. In the process, Mr. McCarty fell and injured himself, breaking his upper arm. He claims that he tripped over a product display sign that was in front of the pile of OSB to the right of the pile he and Mr. Parks were getting their sheets from. Mr. McCarty filed a lawsuit against Menard's, charging it with negligence for having the display sign in a public area, thereby causing a tripping hazard, and failing to keep its premises in a reasonably safe condition. [Dkt. #6, ¶ 5]. Menard's has moved for summary judgment.

**I.**

**SUMMARY JUDGMENT**

**A.**

**Fed.R.Civ.P. 56**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must construe the evidence and all inferences that reasonably can be drawn from it in the light most favorable to the nonmoving party. *Allin v. City of Springfield*, 845 F.3d 858, 861 (7th Cir. 2017); *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 340 (7th Cir. 2016). But, the court makes "only reasonable inferences, not every conceivable one." *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). Importantly, "[the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 721 (7th Cir. 2018)(quotations omitted).

Not every purported factual dispute precludes summary judgment; the factual dispute must be material and genuine. *Alston v. City of Madison*, 853 F.3d 901, 910 (7th Cir. 2017). A factual dispute is "genuine" only if a reasonable jury could find for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Alston*, 853 F.3d at 910 (7th Cir. 2017). If the opponent – here, the plaintiff – "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' summary judgment must be granted." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797-98 (7th Cir. 2017). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When considering a motion for summary judgment, a court "must resist the trap of assessing the credibility of witnesses, choosing between competing inferences or balancing the relative weight of conflicting evidence." *Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir. 2014). *See also Khan v. Midwestern Univ.*, 879 F.3d 838, 840 (7th Cir. 2018). Proper fulfillment of the court's task in summary judgment proceedings in the Northern District of Illinois requires adherence to Local Rule 56.1, which prescribes the format of summary judgment proceedings must take.

**B.**

**The Purpose and Importance of Local Rule 56.1**

**1.**

The Local Rule is critical in the presentation of and opposition to a motion for summary judgment. *Sojka v. Bovis Lend Lease, Inc.,* 686 F.3d 394, 398 (7th Cir.2012). It aids the parties' understanding of the arguments and immeasurably aids the court in *correctly* resolving the motion, which after all is the ultimate purpose of the whole enterprise. *Townsend v. Alexian Bros. Medical Center,* 589 Fed.Appx. 338, 339 (7th Cir.2015);*United States v. Gutierrez Rodriguez*, 288 F.3d 472, 477 (2d Cir. 2002); *Kay v. Board of Educ. of City of Chicago,* 547 F.3d 736, 738 (7th Cir.2008) (Easterbrook, C.J.). *See also WWC Holding Co., Inc. v. Sopkin,* 488 F.3d 1262, 1279-1280 (10th Cir.2007) (Gorsuch, J., dissenting). The Local Rule then goes far in helping to achieve what should be the lawyer's ultimate goal, namely to make it "easier for the court  for the court to rule in his client's favor . . . ." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006).

The Local Rule requires a party seeking summary judgment to include with its motion "a statement of material facts as to which the ... party contends there is no genuine issue and that entitle the ... party to a judgment as a matter of law." Local Rule 56.1(a)(3); *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 643 (7th Cir.2008). Each paragraph must refer to the "affidavits, parts of the record, and other supporting materials" that substantiate the asserted facts. Local Rule 56.1(a)(3); *F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633 (7th Cir.2005). The party opposing summary judgment must then respond to the movant's statement of proposed material facts; that response must contain both "a response to each numbered paragraph in the moving party's statement," Local Rule 56.1(b)(3)(B), and a separate statement "consisting of short numbered

paragraphs, of any additional facts that require the denial of summary judgment," Local Rule 56.1(b)(3)(C); *Ciomber,* 527 F.3d at 643. Again, each response, and each asserted fact, must be supported with a reference to the record. Local Rule 56.1(b)(3)(B); *Cracco v. Vitran Exp., Inc.,* 559 F.3d 625, 632 (7th Cir.2009); *Bay Area Business Council, Inc.,* 423 F.3d at 633.

While the Local Rules regarding summary judgment motions were not intended to provide a maze of technical traps to complicate and delay litigation without advancing the merits, *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011), because of their importance promoting the clarity of summary judgment filings, the district court is entitled to demand strict compliance with its local rules. *Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 537 (7th Cir.2011). Whether it does so ultimately is left to the district court's discretion. *Stevo v. Frasor*, 662 F.3d 880, 886-887 (7th Cir. 2011); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).

When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner the Local Rule demands, those facts are deemed admitted for purposes of the motion. *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015); *Cracco,* 559 F.3d at 632. Adherence to the Local Rule regarding summary judgment presentation aids the parties' understanding of the arguments and immeasurably aids the court in *correctly* resolving the motion. *Townsend v. Alexian Bros. Medical Center,* 589 Fed.Appx. 338, 339 (7th Cir.2015);*United States v. Gutierrez Rodriguez*, 288 F.3d 472, 477 (2d Cir. 2002); *Kay v. Board of Educ. of City of Chicago,* 547 F.3d 736, 738 (7th Cir.2008) (Easterbrook, C.J.). *See also WWC Holding Co., Inc. v. Sopkin,* 488 F.3d 1262, 1279-1280 (10th Cir.2007) (Gorsuch, J., dissenting).

Ultimately then, the Local Rule helps to achieve what should be the lawyer's ultimate goal, namely to make it "easier for the court  for the court to rule in his client's favor . . . ." *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006).

.

## 2.

Local Rule 56.1(b) requires a party's response to a statement of facts to be "concise."  Mr. McCarty's response is not faithful to that requirement. Menard's factual assertions cover about eight pages and Mr. McCarty's responses cover nearly *thirty pages*.  A few specific examples will provide a better idea of the difficulty of sifting through plaintiff's Local Rule 56.1 submission.

At paragraph 8 of its Statement of Facts, Menards asserted, simply, that it operates the retail store where this incident occurred, located at 369 Illinois Rte. 173 in Antioch, Illinois. [Dkt. #55, ¶8].  Despite the straight forward nature of the statement, the response is a four-page breakdown of the store and the managerial hierarchy. [Dkt. #62, at pp. 2-6]. While Mr. McCarty does manage to admit that Menard's operates the store where he tripped, the response is not the "concise response" that Local Rule  56.1(b)(3) demands. This is not, unfortunately, an isolated example; rather, Mr. McCarty's responsive filing continues in that vein throughout.  If Menard's states, uncontroversially, that Mr. McCarty and his employee were shopping for materials at the store on February 13, 2017 [Dkt. #55, ¶11], Mr. McCarty needlessly responds by detailing the entire process from renting a truck driving through a certain gate, at a specific time of day and so forth. [Dkt. #62, ¶¶11-12].  Simple sentences are met with paragraphs of response.  One example (there are many others) should suffice to demonstrate the format. When Menard's asserts – correctly in light of the record – that its store general manager, Naushad Kazi, testified that he routinely patrols the outside yard himself [Dkt. #55, ¶54], Mr. McCarty responded:

Kazi did state that he supervises the entire store including the outside yard and he would do so by walking the yard. He did not use the word "patrol" in his testimony. Moreover, on February 13, 2017 he did not walk in the outside yard prior to the Plaintiff's injury despite the fact that he arrived at either 7:00 a.m. or 8:00 a.m. for work on February 13. (Ex. E, pgs. 53, 60) None of the other Assistant General Managers or the YSR Department Manager or assistant YSR department managers testified that they walked through the east barn before Plaintiffs injury. (Ex. J, pg. 30; Ex. K, pgs. 62-63; Ex. L, pg. 57, Ex. U, pg. 28))

In addition, Menards Policies and Procedures No. 8473 states that a To Do list for the YSR department is to be utilized daily. (Ex. R) The To Do form for the YSR department specifically requires "The below tasks must be completed every day" which tasks include "Safety Inspection been completed and any identified issues fixed, such as trip hazards." (Ex. M, pg. 96, Ex. R) Kazi does not know if the Outside Yard's To Do list was done on February 13, 2017 but if it was completed and turned in to the General Manager's basket as procedure required, it was thrown away the next day. (Ex. M, pgs. 100-102) It was thrown away by Kazi despite the To Do form further stating "This form should be kept in the 1-31 file for 90 days." (Ex. R) Second Assistant General Manager Omar Castadeda testified that this was a breach of Menards Policies and Procedures by not maintaining the Outside Yard's (YSR) To Do lists for the required 90 days.(Ex. J,pg. 14)

As to the safety inspection required for the Outside Yard by Menards Policies and Procedures 8473 (Ex. R), Kazi testified that there are no safety inspections for tripping hazards done for the Antioch Outside Yard department. (Ex. M, pg. 106) First Assistant General Manager Josh Parr agreed there are no safety inspections of the outside barn. (Ex. J, pg. 114) Second Assistant YSR Manager Ryan Lannert testified that there is "no inspection procedure set up by Menards for the outside barn or sheds to ensure that there is no tripping hazards." (Ex. L, pg. 72)

[Dkt. #62, ¶54].

A 380-word response to a seven-word, uncomplicated factual assertion is, in this case, inappropriate. Whether the prolixity is intentional or not – as it sometimes is to obfuscate the facts in order that summary judgment will be denied, *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 513 (7th Cir. 2011) – we need not decide. Regardless of the motive in this case, Mr. McCarty's responses are anything but concise as the Local Rule requires. That the lack of concision makes

analysis more difficult. We do not mean to question the good faith of the plaintiff's capable lawyer. Quite the contrary. His dedication to his client's interests is beyond reproach. The point rather is to illustrate how non-compliance with the Local Rule makes decision more difficult than it would be had there been compliance with the Local Rule.

When Menard's objected to these violations of the Local Rule, Mr. McCarty's counsel conceded that he had failed to follow the Rule and sought to correct what he described as his misunderstanding of it. His counsel said he thought he was supposed to include his additional facts in his responses to Menard's asserted facts, despite the fact that the Rule says that there is to be a responsive statement and a statement of additional facts. Local Rule 56.1(b)(3)(B) and (C). There then followed a separate, five-page statement of 39 additional facts, all of which were short and concise. [Dkt. #65]. As already noted, when a party fails to comply with Local Rule 56.1's directions regarding a response to a statement of facts, courts have discretion to deem the facts admitted. In the main, courts have followed that approach when parties fail to make their responses concise. *See, e.g.*, *Vacation Rental Partners, LLC v. VacayStay Connect, LLC*, 2017 WL 1150806, at *1 n.1 (N.D. Ill. 2017); *Ortega v. Chicago Pub. Sch. of the Bd. of Educ. of the City of Chicago*, 2015 WL 4036016, at *2 (N.D. Ill. 2015); *Holladay v. CME Grp.*, 2014 WL 4358362, at *3 (N.D. Ill. 2014); *Willmott v. Fed. St. Advisors, Inc.*, 2008 WL 2477507, at *1 (N.D. Ill. 2008); *Ercoli v. Paiva*, 2005 WL 1651042, at *2 (N.D. Ill. 2005). Although Mr. McCarty has chosen to allow his 30-page "statement" to stand as his response, he has also filed a compliant statement of additional facts, and so there is something appropriate to consider against Menard's version. And we do so.

## II.

## FACTS OF THE CASE

Robert McCarty and his employee, Tristan Parks, went to the Antioch Menard's to pick up, among other items, some OSB. They rented a Menard's truck, drove it into the lumber shed, and located the OSB they wanted. The material was stacked, horizontally, by size, in a number of side-by-side piles. Mr. McCarty testified that they found the OSB they wanted by looking for the display signs in front of the piles and locating the one for 3/4 inch OSB. [Dkt. # 55-1, at 102]. *See* the photograph *infra*, of Mr. McCarty taken immediately after his fall. Mr. Parks said the same thing. The signs in front of the piles of OSB reflected the type of material and price. [Dkt. #55-2, at 57-58]. A Menard's employee asked if they needed assistance; he was helping other customers and indicated he'd return. Mr. McCarty and Mr. Parks waited for a bit, and then decided to move the boards themselves to adjacent piles until they would come upon the boards they wanted. [Dkt #55, ¶¶ 11-20].[1]

For one reason or another, the top few boards and the 3/4" stack weren't desirable, so the two men began sliding those over to the stacks on the right and left of the 3/4" stack which was in the middle. In doing so, Mr. McCarty would lift a board of a size and type that did not match the type he wanted and move to his right and place it on the adjacent stack. His employee, Mr. Parks, did the same except he would move to his left and place the noncompliant board on the stack on the left. Alternating between the two of them, Mr. McCarty moving sheets to the right and Mr. Parks moving sheets to the left, they moved five or six boards over to neighboring stacks. As Mr. McCarty

---

[1] Mr. McCarty testified that he asked for help. [Dkt. #55-1, at 112-13]. The Menard's employee testified that Mr. McCarty told him "they were good." [Dkt. #55-6, at 46].

explained:

> I moved the sheets from the center pile that were stacked on top of the 3/4 to the right. [Mr. Parks] moved the sheets that were stacked on top of the center pile to the right [sic]. . . . I was doing *one side*, he was doing *the other*. . . . I would pick up the sheet and slide it over the top of the stack and move it over to that side and *then come back* and pick up another sheet and slide it over, move it over - -

[Dkt. #55-1, at 108-09] (Emphasis supplied).

After *several* such moves, Mr. McCarty said he adjusted the top sheet in the pile he had moved the sheets to so that it was out of the way of the pile they wanted. [Dkt #55-1, at 119-20]. He then "*went back* and that's when [he] tripped on the 2-by or whatever it is on the bottom of the sign . . . ." [Dkt #55-1, at 110] (Emphasis supplied).

It bears repeating, as the testimony revealed, that plaintiff and Mr. Parks were moving respectively to their left and right as they were moving boards from the middle stack to those on the adjacent stacks. It was during this process that Mr. McCarty said he tripped over the display sign in front of the right hand pile. [Dkt. #55, ¶ 41; Dkt. ## 55-1, at 109]. The display signs are supported by a pair of 2-by-4s that, ideally, slide under the stack of OSBs so that the sign, indicating the product and price, is flush against the front of the pile. [Dkt. #55-4]. At his deposition, Mr. McCarty explained:

A: Yes. I tripped over that – that piece of wood that's part of the sign.

Q: That sign that has the price on it and the dimensions on it?

A: Yes, it's like a 2-by that sticks underneath the stacks of plywood, OSB.

Q: It can. And on this day it was not.

[Dkt. #55-1, at 109]. Mr. McCarty went on to describe his recollection of the signs:

9

I saw the signs that were in place. I was focused on my 3/4-inch plywood and moving the material either side. That's what we did and then I went back and that's when I tripped on that 2-by or whatever it is at the bottom of the sign and hit my arm on top of the plywood either here or here. I can't remember where I hit.

Q: Either you pulled the sign out or was the sign out when you started?

A: I did not pull the sign out.

Q: So it was there when you started?

A: *I did not see the sign sitting there like that*. I walked up focused on this 3/4-inch and I didn't know that I had any material on top of there that wasn't going to be 3/4-inch and I started moving it over to the right focusing on the 3/4-inch. I wasn't looking behind me.

[Dkt. #55-1, at 110] (Emphasis supplied).

So, according to Mr. McCarty, he didn't see the sign wasn't flush with the pile on the right that he has been moving OSB to because he was so focused on the OSB. [Dkt. #55-1, at 111]. He said had he seen it, he wouldn't have tripped over it. [Dkt. #55-1, at 134].

Mr. Parks also confirmed the process of moving the OSB, which involved lateral movements by Mr. Park and Mr. McCarty:

A. We're standing next to each other, so, you know, he's on a section - he's on a section, so I'll grab and lift and move It. (Indicating.)

Q: Okay. *So you moved about ·· you're showing us you moved about two or three paces from – to your left every time you picked one up?*

A: *Sure*, I mean, I don't know how many paces, how many steps I took from – I wasn't counting my steps, so how –

Q: You're certainly not standing –

MR. HAUSER: Wait, wait, wait. Let him finish it. Now, what did you say?

BY THE WITNESS: Sorry. I'm not counting my steps or how far I'm moving a piece of OSB.

BY MR. ANDREWS: But we know you're not standing in the middle?

A. Right, *I'm not standing in one place and moving it I'm physically –*

Q: Stepping –

A: *– stepping off to the side.*[2]

Q: *And you did that at least five or six times··*

A. Yes.

Q: *-- before his accident?*

A: *Yes.*

Q:*And Bob did about the same before his accident?*

A. *Yeah, I would say that.*

Q: And he moved - he moved the lumber, plywood similarly than you did?

A. Yes.

[Dkt. #55-2, at 62-63] (Emphasis supplied). Mr. Parks doesn't know how Mr. McCarty fell. He "believed" Mr. McCarty tripped over the display sign in front of the pile on the right side of the 3/4" pile. [Dkt. #55-2, at 69]. As Mr. Parks testified at his deposition:

Q: . . . You don't know for sure?

---

[2] Importantly, Mr. McCarty asserts in his Statement of Additional Facts that "[n]either [he] nor Parks testified that Plaintiff walked to the right in moving unwanted sheets." [Dkt. #65, ¶7]. While it is true that Mr. Parks later testified that he wasn't watching Mr. McCarty and didn't know if he took one, two or three steps [Dkt. #55-2, at 110], given Mr. Parks' testimony cited here, it's a mischaracterization of the record to say that neither man testified that Mr. McCarty stepped to the right as he moved his sheets. Moreover, in the portion of Mr. McCarty's testimony cited in the Statement of Additional Facts, Mr. McCarty said each time he moved a sheet, he would then "*come back* and pick up another sheet . . . ." [Dkt. #55-1, at 108-09]. That certainly does not rule out stepping from stack to stack. Quite the contrary. It confirms that is precisely what Mr. Parks said he did "at least five or six times."

A: Correct –

Q: Got it.

A: – because I was moving a piece of wood at the time of the fall.

Q: Okay. So you're kind of looking to the left?

A: Right.

Q: Did not see him tumble?

A: I saw the end of the tumble, him trying to like reach out and break his fall.

[Dkt. # 55-2, at 70].

After Mr. McCarty had fallen, Mr. Parks saw that the sign was askew – it was pulled out from under the stack of OSB, rather than flush against the stack like the other signs. [Dkt. #55-2, at 76-77]. That's why Mr. Parks thought Mr. McCarty tripped over the sign. [Dkt. #55-2, at 77]. He doesn't know whether Mr. McCarty moved the sign, or whether it moved during his fall, or whether it was askew before the fall. [Dkt. #55-2, at 70-71]. Mr. Parks says he took pictures – including the one below – of the site within 10 seconds after Mr. McCarty had fallen. [Dkt. #55-2, at 81].



So, how did the sign get out of place? If one can learn anything from the 1500 or so pages of deposition transcripts the parties have amassed about how Mr. McCarty fell, it's that no one knows. Mr. McCarty's main focus in this regard is the testimony of the second assistant manager of the lumber shed, Ryan Lannert. Testimony from Mr. Lannert's deposition provides a good example of the evidence accumulated in this trip-and-fall case. Mr. Lannert was questioned at length regarding any number of things, including how he thought the sign might have been moved. First was plaintiff's counsel:

> Q: By the way, do you know how long this sign that's shown in the foreground of [the photo included above] was out like that?
>         *     *     *
> A: Oh, I don't know.
>
> Q: Do you know what caused it to be out?
>
> A: I do not.
>
> Q: Okay. You don't have any clue as to how it got out there?
>
> A: Correct.

[Dkt. 62-12, at 56-57]. Plaintiff's counsel circled back around after a while, with similar results:

> Q: Okay, Did anybody ever tell you how the sign had gotten out?
>
> A: No.
>
> Q: Okay. So I take it you have no idea how that sign got out?
>
> A: No.

[Dkt. #62-12, at 80-81]. Plaintiff's counsel went on to ask whether there were inspections for tripping hazards, and Mr. Lannert said they were done every day. When a hazard was found, it was corrected "right away"; no report was made of it. [Dkt. #62-12, at 95]. No one particular employee

was assigned to do this; it was expected of all employees. [Dkt. #62-12, at 95, 115]. Counsel again asked whether Mr. Lannert knew how long the sign was askew and he again said he did not. [Dkt. #62-12, at 95]. He asked again whether Mr. Lannert knew how the sign got out and, again, Mr. Lannert said he didn't. [Dkt. #62-12, at 104]. Plaintiff's counsel asked whether a Menard's employee could have left the sign out, and Mr. Lannert allowed that that was possible. [Dkt. # 62-12, at 104]. He testified it was easy to move the signs; they could be pushed with your foot. [Dkt. # 62-12, at 111].

Then it was defense counsel's turn:

Q: . . . . directing your attention to the sign that is pushed out or pulled out from a flush position as depicted in [the photo], you don't know how that came to be, right?

A:  Correct.

Q: You didn't see it, so you have no idea —

A: Correct.

Q: — how in this case on that day this happened?

A: Correct.

[Dkt. #62-12, at 118]. Again, Mr. Lannert testified, for perhaps the eighth time, that *he didn't know* how the sign became askew. But, defense counsel was unsatisfied and persisted:

Q: Do you know that this guest did it?

A: I do not know.

Q: Do you know if a team member did it —

A: I do not know.

Q: – or if another guest did it?

A: Can't recall.

[Dkt. #62-12, at 118].  Defense counsel, however, was still not satisfied and pressed on:

Q: Is it likely that a team member left a sign out like this or didn't push a sign in like this —

Plaintiff's counsel: Object.

BY Defense counsel: — depicted in this photograph where it's about 18 inches askew like that?

Plaintiff's counsel: Objection.  No foundation for this.

A: It's possible.

BY defense counsel: The question was: is it likely?

Plaintiff's counsel: Objection.  No foundation.

A: Yes.  It is likely.

Q: Why is it likely?

A: I can't think of a reason.

[Dkt. #62-12, at 118-19].  Mr. Lannert went on to explain that the only reason an employee would move a sign out is if they adjusted the stacks of boards – called "down stocking" – and got lazy and didn't replace the sign. [Dkt. #62-12, at 119].

But, there's no *evidence* that there was any down stocking on February 13th. Deposition testimony from another store employee, Zachary Anderson, indicates that, at least at the beginning of the day, the sign was in place:

Q: Okay. Could that sign have been out, as shown in 1C, when you walked around with Tommy that day?

A: Not first thing in the morning.

Q: Why not?

A: Because the yard was clean.

Q: Okay. What do you mean by "the yard was clean"?

A: Everything was 100 percent.

Q: Okay. So the yard – the sign sticking out in 1C and 1D, that would not be 100 percent?

A: No.

Q: Am I correct?

A: That is correct.

[Dkt. #55-6; at 136-37]. The walkaround was done about 5 a.m. [Dkt. #55-6, at 138].

After that, it's anyone's guess how the sign got moved. Again, Mr. Lannert didn't know how the sigh was moved, and could only guess that it might have been an employee if the employee had been down-stocking. Mr. Anderson said he had occasionally seen customers move floor stack signs, but he had never seen an employee move a sign the way the sign in this case was moved. [Dkt. #55-6, at 161]. Testimony from Menard's employees – of varying levels – was uniform in that, if an employee saw a sign out of place, a tripping hazard, they would replace it. Naushad Kazi, the store's general manager, said if he saw a sign out of place he'd push it in. [Dkt. #55-5, at 137]. Mr. Anderson said if he'd seen a sign askew, he'd push it back in place. [Dkt. #55-6, at 163]. Tommy Shelvin, the outside yard manager, testified that if he saw a sign out of place, he would point it out and a team member would put it back. [Dkt. #62-11, at 122]. Mr. Lannert said this was a daily expectation of all employees. [Dkt. #62-12, at 115].

# III.

## ANALYSIS

As the parties agree, Illinois law provides the substantive law in this diversity action. See *Dunn v. Menard, Inc.*, 880 F.3d 899, 905 (7th Cir. 2018). "To establish a cause of action for negligence under Illinois law, a plaintiff must prove: '(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty; and (3) an injury proximately caused by the breach.'" *Dunn*, 880 F.3d at 906 (quoting *Wilfong v. L.J. Dodd Constr.*, 401 Ill.App.3d 1044, 930 N.E.2d 511, 519 (2010); *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1038 (7th Cir. 2016). A business like Menard's owes customers a duty to maintain its premises in a reasonably safe condition to avoid injuries to those customers. *Piotrowski*, 842 F.3d at 1038; *Zuppardi v. Wal–Mart Stores, Inc.*, 770 F.3d 644, 649 (7th Cir. 2014). "Significantly, speculation or conjecture regarding the cause of an injury is not sufficient in Illinois to impose liability for negligence." *Piotrowski*, 842 F.3d at 1038. And it is important to recall that "[s]peculation does not defeat summary judgment." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018). "Speculation" and "conjecture" will not do as a substitute for evidence. "Speculative assertions... are insufficient to establish a genuine dispute about a material fact." *Hamer v. Neighborhood Housing Svcs of Chicago*, _F.3d _, 2018 WL 3615845, *5 (7th Cir. 2018).

## A.

We start with whether Mr. McCarty has established Menard's owed him a duty in this case. He hasn't. The Seventh Circuit in *Dunn* recently set forth the convoluted analysis the law requires in simple trip-and-fall cases:

> Whether a duty exists is a question of law to be determined by the court. Put broadly,

duty is determined by asking whether defendant and plaintiff stood in such a relationship to one another that the law imposed upon defendant an obligation of reasonable conduct for the benefit of plaintiff. As a matter of practical application, however, the concept of duty in negligence cases is very involved, complex and indeed nebulous. The four factors courts typically consider in determining whether a duty exists are: (1) the reasonable foreseeability of injury; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against injury; and (4) the consequences of placing that burden on the defendant.

880 F.3d at 906.

The "open and obvious" doctrine, however, is an exception to the general duty of care owed by a landowner, because persons who own, occupy, or control and maintain land are not ordinarily required to foresee and protect against injuries from potentially dangerous conditions that are open and obvious. *Dunn*, 880 F.3d at 906. Under the open-and-obvious doctrine, a landowner is not liable for physical harm caused to invitees by any condition on the land whose danger is known or obvious to them, unless the landowner should anticipate the harm despite such knowledge or obviousness. *Swearingen v. Momentive Specialty Chemicals, Inc.*, 662 F.3d 969, 972 (7th Cir. 2011). The law assumes that persons who encounter open and obvious conditions will take care to avoid any danger inherent in such condition. *Dunn*, 880 F.3d at 906. The open and obvious nature of the condition itself generates caution and, therefore the risk of harm is considered slight; people are expected to appreciate and avoid obvious risks. *Dunn*, 880 F.3d at 906.

Mr. McCarty argues that neither he nor his employee, Mr. Parks, ever saw the protruding sign or its legs before Mr. McCarty tripped. [Dkt. #61, at 15]. But that's not exactly accurate and, more to the point, it doesn't exactly matter. According to both men, as they drove into the lumber shed, they looked at the signs in front of all the piles of materials as they passed. They had to, because as they testified they were looking at the piles and signs to find the size of OSB that they wanted. So

they saw the signs and, at least, saw that they were in front of each stack of materials. Further, as both men testified, they set about removing the first several sheets of OSB in the middle stack to the left and right to get down to the ones (in the middle stack) they found desirable. As they did so, they moved from the target stack to the stacks on either side. So, Mr. McCarty was, at the very least, right next to the sign he tripped on for however long it took to find the right boards. The signs in front of the three stacks of lumber involved were identical in size and shape. They were about knee high, and the legs were at least 4 inches wide. Yet, Mr. McCarty argues he didn't see the sign over which he tripped.

Mr. Parks specifically testified that they stepped from the target pile (in the middle) over to the piles on the side as they moved the undesirable sheets. Mr. McCarty wasn't as specific, but he did not contradict what Mr. Parks had said. Quite the contrary. He said that after he moved each sheet from the target pile to the pile on the right, he would "*then come back* and pick up another sheet and slide it over, move it over . . . ." [Dkt. #55-1, at 108-09](Emphasis supplied). The evidence reflects that Mr. McCarty saw and negotiated the legs of the sign several times before he tripped. Moreover, unless he was gazing off into the distance, given the height of the piles shown in the included photograph, *see supra* at 13, he would have been looking down as he moved the sheets, even if he were standing in one spot and flinging them sideways – which he wasn't. As he said, he was "focused" on the piles and moving sheets from one to the other. [Dkt. #55-1, at 110].

While it's difficult to believe that, given all this, Mr. McCarty never saw the protruding sign, it doesn't matter whether he saw it or not. True, a court can't make a credibility determination in a summary judgment proceeding. *Orton-Bell*, 759 F.3d at 773. But, in this context, "obvious" is objectively determined. "Thus, the determination of whether the condition is open and obvious

depends not on plaintiff's subjective knowledge but, rather, on the objective knowledge of a reasonable person confronted with the same condition." *Racky v. Belfor USA Grp., Inc.*, 2017 Ill.App. 153446, 83 N.E.3d 440, 467 (1ˢᵗ Dist. 2017). *See also Dunn*, 880 F.3d at 908 (". . . the operative focus is not on *plaintiff* himself, but on a *reasonable person* with plaintiff's knowledge of the situation, and whether such an individual, after exercising ordinary perception, intelligence, and judgment, would have appreciated and avoided the hazard."(emphasis in original)). Here, even drawing reasonable inferences – as opposed to every conceivable inference, *Spitz*, 759 F.3d at 730 – in Mr. McCarty's favor, it has to be said as a matter of law that the tripping hazard of the sign was open and obvious. A reasonable person in Mr. McCarty's position, who saw that there were signs, chose the stack he wanted by looking at the signs, walked right up to the signs, was working within a few feet of the protruding sign, and either repeatedly stepped over it or turned toward it, would have noticed the large sign and legs as a tripping hazard.

For this same reason, Mr. McCarty's assertion that the store's general manager, Mr. Kazi, didn't see the protruding sign until it was pointed out [Dkt. #61, at 15] to him is unavailing. Again, the standard is the reasonable person in the plaintiff's position. Mr. Kazi testified that he didn't see the sign "the minute [he] first got in [the lumber shed]." [Dkt. #55-5, at 131-32]. At that time he didn't know what had happened and, so, he only saw the sign when he was told Mr. McCarty tripped over it. [Dkt. # 55-5, at 132]. Mr. McCarty, as we know, was right next to the sign for a period of time, and either repeatedly stepped over its legs or, at least, repeatedly turned toward it, as he moved sheets of OSB to the pile on his right.

That's all Mr. McCarty has to offer on the open and obvious doctrine. [Dkt. #61, at 15], and its clearly insufficient to withstand summary judgment. That being the case, Mr. McCarty falls back

on the "distraction exception." [Dkt. # 61, at 16]. "The distraction exception applies where the possessor [of land] has reason to expect that the invitee's attention may be distracted, so that he will not discover what is obvious, or will forget what he has discovered, or fail to protect himself against it." *Bruns v. City of Centralia*, 2014 Ill. 116998, 21 N.E.3d 684, 691 (2014)(quotations omitted). Here, Mr. McCarty argues that he was distracted by moving the boards from one pile to the other. [Dkt. #61, at 16]. But there is nothing in the record to suggest that Menard's had reason to expect invitees would move merchandise from one stack to another and disregard an obvious tripping hazard. Indeed, McCarty does not even argue this in his brief. [Dkt. #61, at 15-16]. Moreover, in *Bruns*, where the plaintiff claimed her attention was focused on steps and a door as she walked and tripped on an uneven part of a sidewalk, the Illinois Supreme Court made it clear that "the mere fact of looking elsewhere does not constitute a distraction." 880 F.3d at 909.

Mr. McCarty suggests that the fact that he was involved in a task – as opposed to merely looking elsewhere – constitutes a distraction. Mr. McCarty doesn't cite a case, other than *Bruns*, in support of this theory [Dkt. #61, at 16], but *Bruns* rejected the position that a plaintiff was distracted by focusing on steps and a door and not looking down at where she was walking. *Bruns*, 21 N.E.3d at 694. Significantly, the plaintiff in *Bruns* did not negotiate the flaw in the sidewalk multiple times or even once. She didn't stand next to the flaw in the sidewalk for any period of time before tripping on it. And, the flaw in the sidewalk was not connected to a large, knee-high sign. Here, Mr. McCarty admittedly was right next to the sign for a period of time; he either walked over the legs of the sign several times or at least once, as he admitted, before tripping over it. And, again, the obstacle was far more apparent and obvious than an uneven bit of sidewalk.

Finally, *Bruns* also stated that the distraction exception is only applicable "where evidence exists from which a court can infer that plaintiff was actually distracted." *Bruns*, 21 N.E.3d at 691. The evidence here – Mr. McCarty's own testimony – points the other way. According to him, he was finished moving the OSB boards and had nothing in his hands when he tripped. [Dkt #55-1, at 110, 119-20]. His purportedly distracting task was complete. Perhaps the reason Mr. McCarty fails to cite any "task" cases is because such cases have nothing to do with his spill at Menard's. *Compare Rexroad v. City of Springfield*, 207 Ill.2d 33, 796 N.E.2d 1040, 1042 (2003)(plaintiff instructed to retrieve football helmet, tripped on hole while running with it); *Ward v. K Mart Corp.*, 136 Ill.2d 132, 139, 554 N.E.2d 223, 225 (1990)(plaintiff collided with cement post positioned directly outside store's door while he was carrying a large mirror).[3]

## B.

From a common sense standpoint, it seems that should be the end of it, but it's not, because the existence of an open and obvious danger is not an automatic or *per se* bar to the finding of a legal duty on the part of a defendant. *Dunn*, 880 F.3d at 909–10; (7th Cir. 2018); *Bruns*, 386 Ill.Dec. 765, 21 N.E.3d at 690. Instead, the court still has to assess whether a duty is owed, and must still apply traditional duty analysis to the particular facts of the case. *Dunn*, 880 F.3d at 910. When the hazard is open and obvious as it was here, the first two factors – the reasonable foreseeability of injury and the likelihood of injury – in the duty analysis favor the defendant. That leaves the magnitude of the

---

[3] Other distraction cases not involving tasks found the distraction exception applicable where the plaintiffs had to protect themselves from another hazard: falling debris in *Deibert v. Bauer Bros. Const. Co.*, 141 Ill. 2d 430, 433, 566 N.E.2d 239, 240 (1990), and a misstep on a billboard walkrail in *American National Bank & Trust Co. of Chicago v. National Advertising Co.*, 149 Ill.2d 14, 25, 27–28, 594 N.E.2d 313 (1992). Of course, there was nothing like a second hazard at play in the instant case.

burden of guarding against injury and the consequences of placing that burden on the defendant. *Dunn*, 880 F.3d at 910; (7th Cir. 2018); *Bruns*, 21 N.E.3d at 690.

Here, the only thing that could have prevented Mr. McCarty tripping over the open and obvious sign would be a duty to constantly monitor the positions of these signs throughout the day. There's no evidence how the sign got out of place or when it got out of place. Those points are a matter of speculation which, of course, means nothing at the summary judgment stage. So, while the sign could have been pulled out of place hours before Mr. McCarty got there, it also could have been pulled out of place minutes before he got there, by an employee, or it could have been pulled out of place by a customer. And so, the only way to protect Mr. McCarty from tripping over the open and obvious hazard in this case would be constant or nearly constant monitoring of every aisle in the entire store. That's clearly too much. *See, e.g., Dunn*, 880 F.3d at 910 (even "less onerous safeguards than continuous surveillance, . . . would not be justified given the open and obvious nature of the risk involved."); *Thompson v. Wal-Mart Stores E., L.P.*, 2006 WL 3755301, at *3 (S.D. Ind., 2006)(citing *Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 817 (7th Cir. 2006));

Mr. McCarty says that is not an onerous burden. [Dkt. #61, at 16]. But "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). "Lawyers' talk is no substitute for data." *Phillips v. Allen*, 668 F.3d 912, 916 (7th Cir. 2012). *See also*, *United States v. Morton Salt Co.*, 338 U.S. 632, 653 (1950); *Mitze v. Colvin*, 782 F.3d 879, 882 (7th Cir. 2015). Moreover, the plaintiff's suggestion of constant and continuous surveillance is not only impractical, but to impose such a burden would tend to take premises liability into the realm of strict liability, and that's a bridge too far. Indeed there is no such duty in Illinois as the Seventh Circuit explained in *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 652 (7th Cir. 2014). Accord

*Rosales v. Menard, Inc.*, 2018 WL 2299232, at *3 (N.D. Ill., 2018);*Kozyra v. Dollar Tree Stores*, *Inc.*, 2017 WL 2958103, at *7 (N.D. Ill. 2017) (even accepting that shopping baskets were commonly left on the floor of the store, plaintiff needed to demonstrate that the defendant did not adequately respond to these baskets to establish constructive notice). See also, *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018)(Indiana law).

## C.

And so, as Mr. McCarty cannot establish that Menards owed him a duty to protect him against tripping over the open and obvious sign in this case, summary judgment must be granted in Menard's favor. But, it is worth pointing out that, for many of the reasons already discussed, neither can Mr. McCarty succeed on the element of proximate cause. There are two requirements a plaintiff must meet to establish proximate cause. The defendant's conduct must be an actual cause of the plaintiff's injury, and it must be a legal cause as well. *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002); *In re: Emerald Casino, Inc.*, 867 F.3d 743, 755 (7th Cir. 2017). Actual cause, or cause-in-fact, can be established only where "there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* A defendant's acts are a *legal* cause only if they are "so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Id.*

Again, there is no evidence – only speculation or conjecture – that a Menard's employee was responsible for moving the sign, let alone anything showing it is reasonably certain a Menard's employee was responsible. On this point, Mr. McCarty relies entirely on the testimony of Mr. Lannert [Dkt. # 61, at 11], who stated – when repeatedly pressed – it was likely a Menard's employee was responsible *only if* there had been down stocking. And there is no evidence of when there was down stocking, if there was at all. Importantly, the evidence is that the sign was in place on the

morning of the day Mr. McCarty tripped and there is no evidence down stocking occurred on that day. Another employee, Mr. Anderson, had seen customers move signs in the past. Anyone, customer or employee, could have moved the sign.

## CONCLUSION

Mr. McCarty tripped over an open and obvious hazard – and one that he successfully negotiated before he fell. *See supra* at 11 and 20. At the very least, he stepped over its legs once before tripping and falling. (His employee swore that they had moved the boards from pile to pile at least five or six times). But, in any event, once is enough under the circumstances of this case. When he tripped, Mr. McCarty wasn't carrying anything that might obscure his vision, as he already had finished moving boards to the right and was returning to the middle pile. There is no evidence to show that a Menard's employee had left the sign askew. It bears repeating that "speculation or conjecture regarding the cause of an injury is not sufficient in Illinois to impose liability for negligence." *Piotrowski*, 842 F.3d at 1038. And it is also imperative to recall that "[s]peculation does not defeat summary judgment." *Austin*, 885 F.3d at 1089.

"As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Mr. McCarty hasn't presented any such evidence. Moreover, Mr. McCarty doesn't cite a single case to support his theory of liability. [Dkt. #61, at 9-17]. That failure often results in a waiver, *see, e.g., Thornton v. M7 Aerospace LP*, 796 F.3d 757, 773 (7th Cir. 2015)(argument waived where plaintiff failed to cite any legal authority to support it); *Kmart Corp. v. Footstar, Inc.*, 777 F.3d 923, 934 (7th Cir. 2015), and, in any event, is not a

supportive or persuasive way to argue any point.

Reduced to its essentials, the plaintiff's argument is that any time a customer trips in Menard's, Menard's pays. But that's not the law. *Austin*, 885 F.3d at 1089. In Illinois, there is no duty of continuos monitoring, and neither Menard's nor any storeowner, is presumptively liable for every customer mishap.

The defendant's motion for summary judgment [Dkt. #53] is granted.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/8/18